IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

ANDERSON/GREENWOOD DIVISION

| | |
|---|---|
| Ri'Cha ri Sancho, ) | Civil Action No. 8:15-1353-HMH-KFM |
| Plaintiff, ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| Anderson School District Four, ) | |
| Defendant. ) | |

This matter is before the court on the defendant's motion for summary judgment (doc. 34). The plaintiff, who is proceeding *pro se*, alleges claims against her former employer that have been construed by the court to allege violations of Title VII of the Civil Rights Act of 1964, as amended (*see* doc. 1). Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Civ. Rule 73.02(B)(2)(g) (D.S.C.), this magistrate judge is authorized to review all pretrial matters in employment discrimination cases and submit findings and recommendations to the district court.

The defendant filed a motion for summary judgment on November 4, 2015 (doc. 34). On November 5, 2015, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the plaintiff was advised of the summary judgment procedure and the possible consequences if she failed to respond adequately (doc. 35). The plaintiff filed her response in opposition on December 11, 2015 (doc. 38), and she filed additional attachments on December 15, 2015 (docs. 40, 41). The defendant filed a reply on December 21, 2015 (doc. 42), and the plaintiff filed additional attachments to her response in opposition on December 29, 2015 (doc. 45) and February 17, 2016 (doc. 46).

## FACTS PRESENTED

The plaintiff identifies herself as an African-American (doc. 34-10, pl. dep. 216) and states that her religion is Traditional African (*id.* at 11). She began working for the defendant District as a substitute teacher during the 2004-2005 school year and was hired

by the defendant District in August 2005 as a business teacher at Pendleton High School ("PHS") (doc. 34-6, Merck aff. ¶¶ 2-3).  Dr. Daniel Merck, Principal of PHS during the relevant time period, states in his affidavit that he had concerns with the plaintiff's interpersonal skills and interactions with faculty members (id. ¶ 4).

The plaintiff submitted a timeline "affidavit"[1] in which she states that she went to see Dr. Merck on October 18, 2006, and explained that her classroom door lock was broken, the inside window was open, and she did not want to enter the room alone as it was dark (doc. 38-1 at 32-33, timeline).  The plaintiff was concerned about the safety of technology equipment in the room (id.; doc. 38 at 5-6, pl. resp. to m.s.j.).  According to the plaintiff, Dr. Merck continued to read his papers without looking up, and, when he did look up, he "did not give an earnest impression he thought [the plaintiff's complaints] were important" (doc. 38-1 at 33, timeline).  The plaintiff claims that she received a "disciplinary write-up in her file for reporting the incident, arriving to work too early, and appearing 'argumentative' when explaining what had occurred" (doc. 38 at 6, pl. resp. to m.s.j.).  In his affidavit, Dr. Merck states that the plaintiff came to his office  to express her concern that the custodians were "playing tricks" on her by leaving the door to the inner office in her room open (doc. 34-6, Merck aff. ¶ 6).  Dr. Merck summarized the October 18, 2006, meeting in a letter to the plaintiff (id. & ex. B, letter re: meeting).  According to Dr. Merck's summary, the plaintiff stated that the custodians did not clean the inner office, and this was the fourth time someone entered her room without permission (id.).  Dr. Merck spoke with the Director of Maintenance who informed Dr. Merck that the custodians did clean the inner office and that it would be easy for the door to be left open (id.).  The plaintiff also

---

[1] The timeline is not signed by the plaintiff "under penalty of perjury," and thus does not qualify as an alternative to an affidavit under 28 U.S.C. § 1746 (see doc. 38-1 at 31-33). The plaintiff's complaint, however, was made "under penalty of perjury" and thus qualifies as a verified complaint that is equivalent to an affidavit in opposition to the motion for summary judgment (see doc. 1 at 6). See Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) (a verified complaint is the equivalent of an opposing affidavit, when the allegations contained therein are based on personal knowledge).  Out of an abundance of caution, as the plaintiff is proceeding pro se, the undersigned has considered the factual allegations of both the verified complaint and the timeline.

2

mentioned to Dr. Merck that she did not feel safe in the morning when she arrived to school because sometimes her door was not locked (*id.*).  Dr. Merck advised the plaintiff that, for her safety, it would be wise for her to wait until 7:00 a.m. to enter the building and to allow Coach Moses to escort her to her classroom if she felt that was necessary (*id.*).  Dr. Merck also asked one of the custodians to check the plaintiff's room each morning and to turn on the lights (*id.*).  Dr. Merck also noted in the letter that the plaintiff was "very upset and argumentative in expressing [her] feelings" in the meeting (*id.*).

The plaintiff claims that Dr. Merck "placed another disciplinary write up in [her] file" because she asked a teacher "if he called her 'crazy'" (doc. 38 at 6, pl. resp. to m.s.j.). Dr. Merck states that he summarized the meeting he had with the plaintiff regarding this incident in a letter to the plaintiff (doc. 34-6, Merck aff. ¶ 5).  Dr. Merck states in the letter that the plaintiff came to his office on October 26, 2006, to discuss the incident (doc. 34-6, Merck aff., ex. A).  Dr. Merck told the plaintiff that it was reported that, before the other teacher could explain that he had not called the plaintiff crazy, the plaintiff walked away (*id.*).  Dr. Merck noted that the plaintiff stated in the meeting that this was not meant in a negative way as she was in a hurry (*id.*).  Dr. Merck further noted that he and the plaintiff discussed the importance of listening to others and working with new teachers in order to develop an effective team (*id.*).  The plaintiff claims that the placement of the letter in her personnel file "on the word of a Caucasian employee, with less than one year of service in the District, was another example of disparate treatment . . ." (doc. 38 at 6).

The plaintiff was offered a position at Riverside Middle School ("RMS") for the 2007-2008 school year, and she accepted the position (doc. 34-10, pl. dep. 49).  The plaintiff alleges that in May 2010, a Caucasian teacher, Mary Mullikin, removed ten to twelve feet of wall-mounted student work outside the plaintiff's classroom and threw the work into the bathroom trash can (doc. 1 at 4, comp.; doc. 38-1 at 32, timeline; doc. 34-10, pl. dep. 84-86).  The plaintiff states that she reported the incident to the Assistant Principal, "who did not document the meeting, which was a violation of meeting protocol, however left the Caucasian teacher Mary Mullikin without any references in her personnel folder

pertaining to the incident" (doc. 38 at 7, pl. resp. to m.s.j.).  According to the affidavit of the Assistant Principal at RMS, Jeff Burke, he met with both the plaintiff and Ms. Mullikin to discuss this situation and emphasized the importance of harmony in the work place (doc. 34-8, Burke aff. ¶ 3).  The plaintiff submitted the affidavit of one of Ms. Mullikin's former students who states that he was subjected to "racially motivated mistreatment" by Ms. Mullikin (doc. 38-1 at 36, Williams aff.).  The plaintiff states that the student came to her to request assistance in the matter, and the plaintiff informed the Deputy Superintendent[2] about the incident.  The plaintiff claims the Deputy Superintendent told the plaintiff that she did not want the plaintiff to contact the media and that she (the Deputy Superintendent) would see the situation was addressed (doc. 38 at 7-8, pl. resp. to m.s.j.; doc. 38-1 at 32, timeline).  Ms. Mullikin had no supervisory authority over the plaintiff (doc. 34-10, pl. dep. 90).

In February 2011, Mr. Burke sent an email to teachers at RMS stating that the next day was Friday, but since they had already had a "jeans day" it would need to be a "professional dress day" (doc. 38-1 at 66, emails).  The plaintiff responded in an email, stating, "OOPs! I am just reading this . . . I have on jeans under my dress."  Mr. Burke responded, "Not a problem.  I am not going to hang you by the flagpole.  I heard it was a jean day at the high school so enjoy the day in jeans."  The plaintiff responded, "Thanks! Why would you hang me by the flagpole otherwise?" to which Mr. Burke responded, "That is what they used to do in the old days to pirates.  Just a figure of speech.  Just kidding with you" (*id.*).  The plaintiff states that she "showed she was not amused by the flagpole comment in her email to Mr. Burke" (doc. 38 at 13, pl. resp. to m.s.j.).

The plaintiff states that in May 2011 she was asked by the mother and grandmother of an African-American female student to aid the student who had been accused of bullying a Caucasian student (doc. 38 at 16, pl. resp. to m.s.j.).  She states that

_____

[2] The plaintiff does not name the Deputy Superintendent.  However, Dr. Joanne S. Avery submitted an affidavit in support of the defendant's motion for summary judgment in which she states that she was the Deputy Superintendent during the relevant time period (doc. 34-7, Avery aff. ¶ 2).

4

she asked Mr. Burke to view the school cameras to corroborate the Caucasian student's allegations of bullying, and Mr. Burke later confirmed that the camera did not show that the African-American student hit the Caucasian student as had been alleged (*id.*). The plaintiff states that she provided information to the African-American student's family "to help resolve the issue," and the student "found resolve" after the close of the school year (*id.* at 17).

The plaintiff claims that in August 2011 Interim Principal Dr. Brodie Bricker "verbally accosted [her] in front of a line of parents in the outdoor car line" (doc. 38 at 14, pl. resp. to m.s.j.). The plaintiff testified in her deposition that he yelled "What are you doing?" (doc. 34-10, pl. dep. 187). She testified that she "was the only African-American teacher outside amongst four other teachers . . . all of whom were Caucasian and generally had the same duty" (*id.*). The plaintiff asked Dr. Bricker the next day why he yelled at her, and he responded that he was trying to keep the car line moving (doc. 38 at 15, pl. resp. to m.s.j.). In his affidavit, Dr. Bricker states that he did not yell at the plaintiff because she is African American; he states that he was trying to keep traffic moving, and the plaintiff was standing in the traffic circle talking to a driver (doc. 34-5, Bricker aff. ¶¶ 3-4). The plaintiff claims that Dr. Bricker's actions were "in retaliation against her for assisting to gain resolve in the falsely accused African-American student incident" (doc. 38 at 17, pl. resp. to m.s.j.).

During the 2012-2013 school year, the defendant implemented security measures in the District Office (doc. 34-9, D'Andrea aff. ¶ 6). Specifically, each employee was required to show identification before entering any District building. Several emails were sent to each District employee regarding the system along with a copy of "Electronic Visitors Management System Procedure Guide" (*id.* & ex. D). On February 28, 2013, the plaintiff had a meeting at the District Office. The receptionist at the District Office would not let the plaintiff in because she did not have her ID. According to the plaintiff, she told the receptionist she was a teacher, and the receptionist stated, "I know who you are" (doc. 38 at 4, pl. resp. to m.s.j.). The plaintiff points out that the "Electronic Visitors Management System Procedure Guide" provides that "a visitor can be manually entered <u>no more than</u>

<u>twice</u> before being denied entry" (doc. 34-9, D'Andrea aff., ex. D at 6 (emphasis in original); doc. 38 at 4, pl. resp. to m.s.j.).  The District Office receptionist reported to Dr. Lee D'Andrea, the District Superintendent, that the plaintiff was rude to her when she told the plaintiff that she had to have an ID to enter the building (doc. 34-9, D'Andrea aff. ¶ 7 & ex. E).  In response, Dr. D'Andrea sent an email to all District employees informing them that every employee was required to have an ID to gain entry into the District Office and that rudeness would not be tolerated (*id.*).  Dr. D'Andrea did not use the plaintiff's name in the email or otherwise identify her (*id.*).  The plaintiff claims "this was blatant mistreatment upheld by the Defendant causing psychological distress and disappointment to the Plaintiff" (doc. 38 at 5, pl. resp. to m.s.j.).  The plaintiff requested a meeting with Dr. D'Andrea about the incident, and Dr. D'Andrea agreed to a meeting (*id.*).  However, Dr. D'Andrea cancelled the meeting and did not reschedule (*id.*).

In early February 2013, a Caucasian male student (hereinafter, "the student") in the plaintiff's keyboarding class started misbehaving (doc. 38 at 8-9, pl. resp. to m.s.j.). The plaintiff sent emails to guidance counselor Jeff Rae and Mr. Burke asking whether the student had any impairments so that she could determine the "best course of action for his behavior"; she was told that the  student did not have a Section 504 Plan nor an Individualized Education Program ("IEP") (doc. 38 at 9, pl. resp. to m.s.j.; doc. 38-1 at 42-44, emails).  On February 25, 2013, the plaintiff emailed Mr. Burke to ask how she should deal with the student (doc. 34-8, Burke aff. ¶ 4 & ex. A, emails).  Mr. Burke responded the same day that he thought contact to the home would be an effective way to handle the situation (*id.*).  The plaintiff responded, "Will try to remind myself to do this today.  I believe I will take a special interest in him. Let the mission begin" (*id.*).  On February 26, 2013, the student told the plaintiff to "shut the f---- up" when she asked him to remain on task (doc. 38 at 9, pl. resp. to m.s.j.).  The plaintiff prepared a discipline referral form, which stated that the student had been given a verbal warning and a written warning prior to the referral (doc. 38-1 at 40, discipline referral form).  The student's parents contacted Mr. Burke on March 1, 2013, because they were concerned that they were not notified that the plaintiff was

6

having any problems with their son in her class (doc. 34-8, Burke aff. ¶ 4 & ex. B, emails). Mr. Burke emailed the plaintiff and asked her to call the student's parents to talk about the student's behavior (*id.*). Mr. Burke also informed the plaintiff that the student's parents told him that the student forgot to take his medicine some days so that might be the reason for his behavior (*id.*). The plaintiff responded that she assumed the "first long form would have been sent to his parents – which would have been 'contact.' . . . I have an issue with the medicine" (*id.*). The plaintiff thereafter contacted the student's parents about the student's behavior (doc. 38 at 10, pl. resp. to m.s.j.; doc. 38-1 at 55, email).

On Friday, April 12, 2013, the plaintiff emailed guidance counselor Marilyn Duncan and Mr. Burke informing them that the student told her that she "looked like a graceful monkey as I jumped happily at my table" (doc. 34-8, Burke aff. ¶ 5 & ex. C, emails). The plaintiff stated that she continued instruction but "afterwards asked [him] to come to the side to explain to him that perhaps he needed to speak with [you] about his comments which could be considered a racial slur" (*id.*). The student's mother emailed the plaintiff the following Monday and stated that her son was upset because "his conversation with you on Friday left him with the impression you believe he is a racist" (*id.* & ex. D, emails). The student's mother wanted to set up a meeting to discuss her son's "negative classroom behaviors and how they are affecting you and his peers" (*id.*). The plaintiff and the student's mother arranged a meeting, and the plaintiff requested that Ms. Duncan or Brenda Elmore[3] "sit in on this meeting" (*id.*). Mr. Burke states in his affidavit that he attended the meeting with the plaintiff and the student's mother, but the meeting "was not very constructive due to [the plaintiff's] defensive and argumentative demeanor" (*id.* ¶ 7). Mr. Burke "determined that it would be best to end the meeting and for the student to be present during the next meeting so his behavior could be discussed fully" (*id.*). The plaintiff states in her response to the motion for summary judgment that this meeting with the plaintiff's mother occurred on April 19, 2013, and neither Ms. Elmore nor Ms. Duncan

---

[3] The plaintiff does not identify the position held by Ms. Elmore.

responded to her request that they sit in on the meeting (doc. 38 at 10, pl. resp. to m.s.j.). Mr. Burke and guidance counselor Mr. Rae attended the meeting with her and the student's mother.  The plaintiff states that she wanted Ms. Elmore or Ms. Duncan to attend because she "wanted a supportive staff member in the meeting, as her prior experiences with Burke and Rae in meetings did not demonstrate that they were supportive of her (i.e., meeting with Mary Mullikin)" (*id.*).  The plaintiff "perceived the meeting with the mother ended well," and Mr. Burke suggested that another meeting be held with the student present (*id.*).

On April 24, 2013, the plaintiff found two pictures of Curious George, the cartoon monkey, in her printer.  The plaintiff sent an email requesting that the technology department determine which computer printed the pages (doc. 41-1 at 4-5, emails).  The plaintiff was told there was "no way to find out that info" (*id.*).  The plaintiff responded asking to "[p]lease clarify in technical terms" (*id.*).  The plaintiff states that she did not receive a response to her request (doc. 38 at 11, pl. resp. to m.s.j.).

On April 25, 2013, the student told the plaintiff that, when he entered her classroom he "craved pork chops" and that his mother made the "best pork chops" (doc. 38-1 at 32, timeline).  The plaintiff considered this "another slur, cultural in nature" due to the fact that she wears a headdress in honor of her traditional religion, many of her students asked if she was Muslim, Muslims do not consume pork, and many students and employees knew the plaintiff was a vegetarian (doc. 38 at 11, pl. resp. to m.s.j.).  The plaintiff states that she informed the Deputy Superintendent and Assistant Principal about the comment, but no disciplinary action was taken against the student (*id.*).

On April 26, 2013, the plaintiff met with Dr. Avery to get advice about how to handle an upcoming meeting with the father of the student.  According to the plaintiff, Dr. Avery told her to focus on the student's behavior that did not involve the racial slurs he made (doc. 38-1 at 31, timeline).  Prior to the meeting , Mr. Burke also met with the plaintiff to discuss the topics that would be covered (doc. 34-8, Burke aff. ¶ 8).

On April 30, 2013, the student's father met with the plaintiff, Mr. Rae, and Mr. Burke (doc. 34-8, Burke aff. ¶ 9; doc. 38 at 12, pl. resp. to m.s.j.).  Mr. Burke states in his

8

affidavit that the plaintiff discussed the comment regarding the pork chops and the Curious George picture, and the student's father stated that the plaintiff was wrongfully accusing his son (doc. 34-8, Burke aff. ¶ 9). The student's father referred to Mr. Burke by his first name to which the plaintiff responded, "So now we are on first name basis?" (*id.*). The father then told Mr. Burke that he had enough and was leaving. Mr. Burke summarized the meeting in a letter to the plaintiff in which he told her that he thought she acted in an unprofessional manner (*id.* & ex. F). With regard to the Curious George incident, Mr. Burke stated in the letter: "You presumed that [the student] left the pictures on purpose. Without any proof you thought he did it because of his earlier comment about a monkey. You accused him of being a racist with no credible proof other than your perceptions" (*id.*).

The plaintiff states that Mr. Burke urged her to tell the father about the Curious George incident in the meeting, and Mr. Burke brought up the pork chop comment (doc. 38-1 at 31, timeline). She states that the father became upset and belligerent and accused her of being disrespectful after which the father stated, "Burke, can we meet without her!" (*id.*). The plaintiff states that she "felt [like] the victim of a scheme of which [she] was unaware of the point" (*id.*). Mr. Burke followed the father, who stopped outside the door and pointed his finger at Mr. Burke and stated, "If you don't do something with her . . . I'm going to give her a ----- full" (doc. 38-1 at 31-32, pl. resp. to m.s.j.). The plaintiff states that she felt frightened and threatened (*id.*).

In her deposition , the plaintiff testified that she checked her mailbox at school one morning and found a picture of a person[4] eating a piece of barbecue chicken (doc. 34-10, pl. dep. 81). The person eating the chicken had on an apron that had stains on it (*id.*). At the end of the day, Mr. Burke asked her, "How did you like that picture I put in your box?" (*id.* at 82). The plaintiff felt like Mr. Burke was trying to be funny and that it was "offensive against [her] as a person" because is a vegetarian (*id.* at 82-83). Mr. Burke states in his

---

[4] In her response in opposition to the motion for summary judgment, the plaintiff states that the picture was of a Caucasian male, and it was on regular photo paper (doc. 38 at 12, pl. resp. m.s.j.).

affidavit that each year Chik-Fil-A provides coupons to recognize Teacher Appreciation Week, and he puts the coupons in every teacher's mailbox.  He does not specifically recall placing a coupon in the plaintiff's mailbox, but states that he would have done so since she was a teacher in the school.  He states that he never placed a picture of someone eating chicken in the plaintiff's mailbox to discriminate or retaliate against her because she is a vegetarian or because of her religion. He further states that he did not know at that time that the plaintiff is a vegetarian, and he is unsure what religion the plaintiff practices (doc. 34-8, Burke aff. ¶ 10).

The plaintiff claims that in a May 2013 meeting with Dr. Kevin Black, the Principal of RMS, she was referred to as "dingy," which she found "offensive and insensitive" (doc. 38 at 13, pl. resp. to m.s.j.).  According to the plaintiff, Dr. Black "then countered this statement with 'but you are not'" (*id.*).

Also in May 2013, the plaintiff states that a Caucasian teacher prompted four or five Caucasian students to picket the lunch-time meeting of the "No Negativity Club" that the plaintiff sponsored (doc. 1 at 4, comp.; doc. 38 at 13, pl. resp. to m.s.j.).  The plaintiff claims the other teacher admitted that she counseled the students on how to picket the club meeting (doc. 38 at 14, pl. resp. to m.s.j.).  The plaintiff reported this to Dr. Black (*id.* at 13). Dr. Black states in his affidavit that, after speaking with the plaintiff and the other teacher, he determined that the other teacher did not encourage or intend for students to picket the meeting (doc. 34-4, Black aff. ¶ 3).

The defendant's Policy GBEB Staff Conduct prohibits harassment, discrimination, and other inappropriate conduct by District employees (doc. 34-9, D'Andrea aff. ¶ 4 & ex. B).  It is also the defendant's policy to provide equal opportunity to all persons without regard to race, creed, religion, national origin, sex, age, or disability (*id.* ¶ 3 & ex. A).  The defendant's Policy GBK provides a structure for grievances if an employee believes the defendant has failed to adhere to its policies (*id.* ¶ 5 & ex. C).

On May 13, 2013, the plaintiff filed a grievance with the District in which she stated that she believed Policy GBEB Staff Conduct and Policy GBE Section:  Cultural

Diversity had been violated (*id.* ¶ 8 & ex. F). Dr. Black met with the plaintiff on May 17, 2013, and summarized the meeting in a letter to the plaintiff dated May 20, 2013 (doc. 34-4, Black aff. ¶ 5 & ex. A, letter). During this meeting, the plaintiff stated that she wanted a cultural diversity training program for students and staff. In response, Dr. Black assured the plaintiff that all new employees to the District take a class on cultural diversity (*id.*). The plaintiff also requested that a new policy be created to address issues of cultural and diversity discrepancies (*id.*). Dr. Black informed the plaintiff that any policy change requests would need to be addressed with the Superintendent's Office (*id.*). The plaintiff also requested a written apology from Mr. Burke based on his statement in the April 30, 2013, letter in which he stated that "you [the plaintiff] accused him [the student] of being a racist with no credible proof other than your perceptions" (*id.*; doc. 34-8, Burke aff., ex. F). Dr. Black noted that he discussed the situation with Mr. Burke, and they both agreed that the statement was not an accurate description of what took place or what Mr. Burke personally believed (doc. 34-4, Black aff., ex. A). Accordingly, Dr. Black asked Mr. Burke to retract the statement and replace it with the following, "You questioned the motives behind some of his comments and took the opportunity to educate him about how they could be perceived racial in nature by certain members of society" (*id.*). The plaintiff also requested an apology for the lack of followup from administration with regard to the student. Dr. Black noted that, while he felt more could have been done proactively, he did not believe it was an intentional lack of support (*id.*).

On May 31, 2013, during a school-wide gathering in the gym, "two Caucasian male teachers who stand nearly six feet in height" obstructed the plaintiff's view. The plaintiff asked them to move over and then tapped one of them on the shoulder. The plaintiff claims the man stated, "Did you hear something" in a sarcastic tone, and the other man responded, "No" (doc. 38-1 at 31, timeline; doc. 1 at 4, comp.). The plaintiff states that she "did not bother to report [this] to the administration " "as she was already undergoing grievance procedures for [Mr.] Burke and had not received a resolve to the Caucasian male student" (doc. 38 at 14, pl. resp. to m.s.j.).

11

The plaintiff appealed her grievance to Dr. Avery, who was then the Deputy Superintendent, on May 23, 2013 (doc. 34-7, Avery aff. ¶ 7 & ex. C). Dr. Avery met with the plaintiff on June 4, 2013, along with Dr. Black and Mr. Burke (*id.* ¶ 8). The plaintiff requested that certain parts of the May 20, 2013, summary of the May 17th meeting with Dr. Black be edited (*id.*). The defendant complied with this request and edited the letter (*id.* & ex. D). Also during this meeting, Mr. Burke apologized to the plaintiff if she felt unsupported and assured the plaintiff that he would continue to support her (*id.*). In a letter dated June 6, 2013, Dr. Avery summarized the June 4th meeting and attached a copy of the edited May 20th letter (*id.*; *see also* doc. 34-4, Black aff. ¶ 6).

The plaintiff then appealed her grievance to Dr. D'Andrea, who was at that time Superintendent of the District (doc. 34-9, D'Andrea aff. ¶ 8 & ex. G). Dr. D'Andrea met with the plaintiff and detailed the defendant's diversity training efforts and also stated that Mr. Burke would provide her a written apology prior to the start of the 2013-2014 school year (*id.* ¶ 9 & ex. H).

The plaintiff further appealed her grievance to the District's Board of Trustees in a letter dated July 23, 2013. In the letter, the plaintiff also requested a leave of absence for the 2013-2014 school year to pursue a Ph.D. (doc. 34-9, D'Andrea aff. ¶ 10 & ex. I). The plaintiff stated in the letter, "I know resolve is difficult in short term, however, I have informed the administration at the district and school levels each year for four years now of a different occurrence violating our policies and are [sic] not certain I feel ready to withstand any further reprisals - with subsequent recants - during the next school year" (*id.*).

Mr. Burke sent a letter to the plaintiff dated July 30, 2013, in which he offered an apology for the following statement the letter dated April 30, 2013, "You accused him of being a racist with no credible proof other than your perceptions" (*id.* ¶ 9 & ex. H, letter). Mr. Burke stated in the apology letter that he did not intend to imply that the plaintiff called the student a racist but rather intended to communicate that the plaintiff was concerned that some of the things the student said could be taken as racist comments (*id.*).

On July 31, 2013, Dr. D'Andrea responded to the plaintiff's July 23rd letter, stating the Board granted her request for an unpaid leave of absence for the 2013-2014 school year (*id.* ¶ 11 & ex. J). Additionally, Dr. D'Andrea informed the plaintiff that the Board reviewed her grievance and believed that the administration effectively addressed her concerns (*id.*).

The plaintiff claims that she met with Dr. Avery in June 2013 concerning steps she needed to take to have her certificate renewed, which was required by the end of the 2012-2013 school year (doc. 38 at 19-20, pl. resp. to m.s.j.). The plaintiff states that Dr. Avery told her that she would need to ensure that her professional development, Master's degree, and technology classes were correct in PDTrakker software (*id.*). She claims that she was informed by Dr. Black that she was the only employee who did not appear "in his administrative view to approve her classes" (*id.* at 20). The plaintiff contends that Dr. Black had no difficulty processing information for a Caucasian teacher (*id.*; doc. 38-1 at 103, email). The plaintiff claims that Dr. Avery was responsible for entering the recertification data for the plaintiff for the Department of Education (*id.*). She further claims that the update of her recertification technology proficiencies has not been submitted by the defendant and is vacant in her current Department of Education certification record (*id.* at 20-21).

The plaintiff claims that the defendant retaliated against her for filing a grievance at the second level by threatening to remove an excess of $1,000 in increments from her monthly pay (doc. 1 at 4, comp.). She alleges that this occurred one day after she "escalated the grievance against Administrator Burke," when she received an email stating that her pay would be docked over the next few paychecks, and the first deduction would be in three days (doc. 38 at 17, pl. resp. to m.s.j.). Dr. Avery states in her affidavit that, during the 2012-2013 school year, the defendant installed a new software system to account for days taken off (doc. 34-7, Avery aff. ¶ 5). An email was sent to the plaintiff and several other employees regarding payment being docked for personal days (*id.*). After the email was sent, the defendant determined that it would not dock the pay of the employees

13

because there was confusion on how to enter personal days versus sick days (*id.*).  As a result, the defendant sent an email to all recipients of the previous email that it could be disregarded (*id.*).  Dr. Avery states that the plaintiff was not singled out or treated any differently because of any complaints she had made (*id.*).  The plaintiff contends that the email sent to her did not include any additional recipients (doc. 38 at 17, pl. resp. m.s.j.).

## APPLICABLE LAW AND ANALYSIS

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment:  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257.  In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324.  Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252.  Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion.  *Id.* at 248. "Only disputes over facts that might affect the

14

outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The plaintiff does not set out causes of action in her complaint (*see* doc. 1).  However, based upon the facts alleged in the complaint and the plaintiff's deposition testimony, the defendant has construed the complaint as alleging the following claims:  1) disparate treatment based on race, national origin, religion, or gender in violation of Title VII; (2)  hostile work environment based on race, national origin, religion, or gender in violation of Title VII; (3)  retaliation in violation of Title VII; and (4)  a state law claim for defamation.  The plaintiff appears to agree that these are the appropriate causes of action for consideration by the court (*see generally* doc. 38, pl. resp. to m.s.j.).

### Disparate Treatment

""The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 135 (2000).  A plaintiff can establish discrimination under Title VII "through direct and indirect evidence," also known as the "mixed-motive" framework or through the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), also known as the "pretext" framework. *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir.2015).  Under the "mixed-motive" framework, a plaintiff succeeds if he "demonstrates that [a protected characteristic] . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 317 (4th Cir.2005) (internal quotation marks omitted).  This evidence must both display a "discriminatory attitude" and bear a causal relationship with the adverse employment action. *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir.2006).  The plaintiff has made no such showing here.

Accordingly, the undersigned will consider the plaintiff's disparate treatment claim under the pretext framework.  To establish a *prima facie* case of discrimination, a plaintiff must prove that:  (1)  she was in a protected class; (2)  she was performing her job

in a satisfactory manner; (3) the employer took an adverse action against her; and (4) the alleged adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir.2004) (en banc). An inference discrimination could be based on a comparison to the treatment of similarly situated co-workers of different races, religions, or national origins, if those colleagues were treated more favorably under similar circumstances. *See Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 265 (4th Cir. 2008). If the plaintiff can establish a *prima facie* case, the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions against the plaintiff. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-55 (1981) (this is a burden of production, not persuasion). If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was a pretext for discrimination. *See Reeves*, 530 U.S. at 147.

Here, the plaintiff cannot establish the third and fourth elements of a *prima facie* case of discrimination. "An adverse employment action is a discriminatory act that 'adversely affects the terms, conditions, or benefits of the plaintiff's employment.'" *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir.2007) (quoting *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir.2004)). Typical examples of adverse employment actions include "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir.1999).

The plaintiff apparently contends that she suffered the following adverse employment actions: the defendant gave her "disciplinary write-ups" for reporting to Dr. Merck that her classroom door lock was broken and for asking another teacher if he called her "crazy" (doc. 38 at 3, 5-6, pl. resp. to m.s.j.); the defendant supported the actions of Ms. Mullikin in taking down student work despite the plaintiff's complaint (*id.* at 6-7); the defendant failed to support her in meetings with the parents of the student who made inappropriate comments in her class and also failed to discipline the student (*id.* at 8-12);

16

Mr. Burke placed an image of "a Caucasian male in a barbecue stained apron with chicken" in her mailbox (*id.* at 12-13); Dr. Black referred to her as "dingy" (*id.* at 13); a fellow teacher prompted Caucasian students to picket a club the plaintiff sponsored, and Dr. Black failed to discipline the teacher (*id.* at 13-14)*;* two Caucasian male teachers obstructed her view during a school-wide gathering (*id.* at 14); Dr. Bricker "verbally accosted" her in the car line but said nothing to the four Caucasian employees who were also on duty (*id.* at 14-15); she was denied entry to the District Office for a committee meeting (*id.* at 4); and the defendant was slow to respond "in providing resolve for her recertification" (*id.* at 23).

Viewing the evidence in a light most favorable to the plaintiff and assuming the above actions by the defendant occurred as described by the plaintiff, the defendant's actions are not adverse employment actions as a matter of law as they did not adversely affect the terms, conditions, or benefits of the plaintiff's employment. The most significant actions alleged by the plaintiff are the following:

(1)   Dr. Merck's letter dated October 26, 2006, in which he summarized a meeting with the plaintiff on October 18, 2006, about her classroom safety concerns and noted that the plaintiff was "very upset and argumentative in expressing [her] feelings" in the meeting, a copy of which was sent to Dr. Avery (doc. 34-6, Merck aff., ex. B, letter re: meeting);

(2) Dr. Merck's letter also dated October 26, 2006, in which Dr. Merck summarized a meeting with the plaintiff on that same date regarding the plaintiff approaching another teacher and telling him that she heard he had called her "crazy." Dr. Merck stressed "how important it is to listen to others and work with new teachers in order to develop an effective team" and noted that the plaintiff was "very cordial during the meeting" (doc. 34-6, Merck aff., ex. A);

(3)   Mr. Burke's letter dated April 30, 2013, in which he expressed "disappointment and embarrassment over [the plaintiff's] manner in the conference" with the student's father, a copy of which was sent to Dr. Black  (doc. 34-8, Burke aff., ex. F, letter re: meeting). Mr. Burke further noted in the letter,"You presumed that [the student] left the pictures on purpose.  Without any proof you thought he did it because of his earlier comment about a monkey.  You accused him of being  a  racist  with  no  credible  proof  other  than  your

perceptions" (*id.*).  This portion of the letter was later edited to state, "You questioned the motives behind some of his comments and took the opportunity to educate him about how they could be perceived racial in nature by certain members of society" (doc. 34-4, Black aff., ex. A), and Mr. Burke issued a written apology to the plaintiff that was added to her personnel file at her request (doc. 34-9, D'Andrea aff. ¶ 9 & ex. H, apology letter).

"To the extent the letter[s] could be construed as a letter of reprimand, courts have held that letters of reprimand and admonishment are not actionable adverse employment actions." *Livingston v. Wix*, C.A. No. 3:13-CV-02695-JMC, 2014 WL 7369502, at *10 (D.S.C. Dec. 29, 2014) (citing *Johnson v. Danzig*, 213 F.3d 631 (4th Cir. 2000)).  *See, e.g., Dawson v. United States*, 549 F.Supp.2d 736, 742 (D.S.C. 2008) (finding poor performance reviews and written reprimands did not constitute adverse employment actions).

The plaintiff states in her response to the motion that she "considers the Defendant's failure to communicate a resolution to the plaintiff's inevitable interaction with the Caucasian male student during the 2013-2014 school year[5], as well as an unsecure promise of maintaining a position for her following a leave of absence as an adverse employment action" (doc. 38 at 21, pl. resp. to m.s.j.).  To the extent the plaintiff is attempting to meet the adverse employment action element of her *prima facie* case of discrimination by claiming the defendant constructively discharged her, such claim fails. "Constructive discharge occurs in the employment discrimination context when an employer deliberately makes the working conditions of the employee so intolerable in an effort to induce the employee to quit or force the employee into involuntary resignation." *Bradley v.*

---

[5] The plaintiff explains in her response that she taught two courses that were linked (Keyboarding and Computer Applications) for purposes of obtaining a high school credit (doc. 38 at 8, pl. resp. to m.s.j.). Thus, all students who entered Keyboarding in the seventh grade and passed it would be signed up for the second course in the eighth grade (*id.*). The plaintiff was the only teacher who taught these courses for high school credit (*id.*). The student discussed herein was a seventh grader in the plaintiff's Keyboarding class who thus presumably would have been in the plaintiff's Computer Applications class for the 2013-2014 year had she not taken a leave of absence (*id.* at 8-9).

*U.S. Foods, Inc.*, C.A. No. 4:14-CV-1772-RBH, 2015 WL 5158731, at *19 (D.S.C. Sept. 2, 2015) (citing *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1353-54 (4th Cir.1995)). Here, a reasonable jury could not conclude that the defendant's actions constitute constructive discharge. As the Honorable R. Bryan Harwell, United States District Judge, recently stated, "[The] plaintiff complains of heightened scrutiny and [Performance Improvement Plans], which do not constitute constructive discharge as a matter of law." *See id.* at *5. (citing *Auriemma v. Logan's Roadhouse, Inc.*, C.A. No. 7:12cv00284, 2012 WL 5844967, at *4 (W.D.Va. Nov.19, 2012) (heightened oversight and scrutiny, threats to report her for minor infractions, and failure to respond to her complaints, requests, and inquiries are not plausibly adverse employment actions and "they do not plausibly show the intolerability requirement necessary for a constructive discharge"); *Shetty v. Hampton Univ.*, C.A. No. 4:12cv158, 2014 WL 280448, at *17 (E.D.Va. Jan.24, 2014) (finding PIP not enough to substantiate constructive discharge claim)). Similarly here, the complained-of actions by the defendant could not reasonably be found to have deliberately made the plaintiff's working conditions intolerable in an effort to induce her to take a leave of absence. *See, e.g., Williams v. Giant Food Inc.*, 370 F.3d 423, 434 (4th Cir.2004) ("Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.") (citation omitted).

The plaintiff argues that she was subjected "to harsher disciplinary measures than her Caucasian counterparts" (doc. 38 at 21). To establish a *prima facie* case of discriminatory discipline under Title VII, the plaintiff must show: (1) she is part of a class protected by Title VII; (2) her prohibited conduct was comparably serious to misconduct by employees outside the protected class; and (3) the disciplinary measures taken against her were more harsh than those enforced against other employees. *Prince-Garrison v. Md. Dept. of Health and Mental Hygiene*, 317 F. App'x 351, 353 (4th Cir. 2009) (citing *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir.1993)). "An allegation of discriminatory

19

discipline[,] however, does not necessarily require proof of an adverse employment action."
*Id.*

The plaintiff claims that she was "written up for things that were ridiculous" (doc. 34-10, pl. dep. 174-75) while Caucasian employees were not written up for similar conduct. However, the plaintiff has failed to present evidence that permits the necessary comparison. To show similarly situated colleagues were comparators, a plaintiff must show that "they are similar in all relevant respects to their comparator." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir.2010). "Such a showing would include evidence that the employees 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.' " *Id*. (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992)). While such comparisons "will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances," nonetheless, a plaintiff can only draw a comparison where "discipline [is] imposed for like offenses." *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir.1993). Here, as set forth above, the letters written by the plaintiff's superiors resulted from the plaintiff's argumentative and defensive responses to incidents rather than the underlying events, and the plaintiff has failed to show that other employees of a different race, religion, gender, or national origin received more favorable treatment under similar circumstances. Further, the defendant has presented testimony by Mr. Burke that, during the relevant time period, he issued several disciplinary warnings to Caucasian teachers working at RMS for failing to follow policies and procedures (doc. 34-8, Burke aff. ¶ 12). To the extent the plaintiff contends that she was subjected to a "disciplinary measure" when Dr. Bricker "verbally accosted [her] in front of a line of parents in the outdoor car line" (doc. 38 at 14, pl. resp. to m.s.j.), Dr. Bricker states in his affidavit that he did not yell at the plaintiff because she is African American; he states that he was trying to keep traffic moving, and the plaintiff was standing in the traffic circle talking to a driver (doc. 34-5, Bricker aff. ¶¶ 3-4).

20

Even if the plaintiff could establish a *prima facie* case of disparate treatment, the defendant has articulated a legitimate, non-discriminatory reason for each of its actions. Accordingly, the plaintiff must show by a preponderance of the evidence that the proffered reasons were pretext for discrimination on the basis of her race, gender, national origin, or religion.    Here, the plaintiff has failed to present any evidence that the defendant reprimanded her or placed letters of counseling in her file due to her race, national origin, religion, or gender.  Based upon the foregoing, summary judgment should be granted as to the plaintiff's disparate treatment cause of action.

### Hostile Work Environment

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . .  42 U.S.C. § 2000-2(a)(1). Because "an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." *Walker v. Mod-U-Kraf Homes, LLC,* 775 F.3d 202, 207 (4th Cir.2014) (citation omitted).  To avoid summary judgment on her hostile work environment claim, the plaintiff must point to evidence that would allow a reasonable jury to conclude that:  (1)  she was harassed based on her race, color, religion, sex, or national origin ; (2)  the harassment was unwelcome; (3)  the harassment was sufficiently severe or pervasive to create an abusive working environment; and (4)  some basis exists for imputing liability to the employer. *Equal Emp't Opportunity Comm'n v. Central Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009).  A work environment is hostile when "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations omitted).  In determining what constitutes "severe and pervasive" conduct, courts must look at all the circumstances, including frequency of the discriminatory conduct and its severity; whether it is physically threatening or humiliating or merely

21

constitutes offensive utterance; and whether it unreasonably interferes with an employee's work performance. *See id.* at 23.

The plaintiff alleges the following conduct by the defendant: the defendant gave her "disciplinary write-ups" for reporting to Dr. Merck that her classroom door lock was broken and for asking another teacher if he called her "crazy" (doc. 38 at 3, 5-6, pl. resp. to m.s.j.); the defendant supported the actions of Ms. Mullikin in taking down student work despite the plaintiff's complaint (*id.* at 6-7); the defendant failed to support her in meetings with the parents of the student who made inappropriate comments in her class and also failed to discipline the student (*id.* at 8-12); Mr. Burke placed an image of "a Caucasian male in a barbecue stained apron with chicken" in her mailbox (*id.* at 12-13); Dr. Black referred to her as "dingy" (*id.* at 13); a fellow teacher prompted male Caucasian students to picket a club the plaintiff sponsored, and Dr. Black failed to discipline the teacher (*id.* at 13-14)*;* two Caucasian male teachers obstructed her view during a school-wide gathering (*id.* at 14); Dr. Bricker "verbally accosted" her in the car line but said nothing to the four Caucasian employees who were also on duty (*id.* at 14-15); she was denied entry to the District Office for a committee meeting (*id.* at 4); and the defendant was slow to respond "in providing resolve for her recertification" (*id.* at 23). In her deposition, the plaintiff also identified the following actions by the defendant as instances of harassment: Dr. Bricker sent her a letter regarding not being in the classroom (doc. 32-10, pl. dep. 204); Mr. Burke came into her classroom to observe and did not speak to her (*id.* at 194); Mr. Burke made "her the villain each time [she] was the victim" (*id.* at 203); and Dr. Avery put "a checkmark on . . . [the plaintiff's] recommendation[6] for the Department of Defense" (*id.*). Here, no

---

[6] In her affidavit, Dr. Avery states that the plaintiff asked her to provide a recommendation for a job with the Department of Defense. Dr. Avery did so, describing the plaintiff as "extremely intelligent and intuitive" with "tremendous work ethic and passion for helping young people." She further stated that the plaintiff would be an "asset to this program" (doc. 34-7, Avery aff. ¶ 4 & ex. A). In completing the form, Dr. Avery states that she inadvertently checked the box "No" in answer to the question if she would reemploy the plaintiff (*id.*). Dr. Avery was unaware she had done so until the plaintiff told her months later. Dr. Avery asked if there was anything she could do to rectify the situation, and the plaintiff replied "no" (*id.*).

reasonable jury could find that defendant's conduct rose to the level of severe and pervasive.

Furthermore, the plaintiff has failed to show that the alleged conduct was based on her race, color, religion, sex, or national origin. The plaintiff generally argues that "the only difference present between she and employees of the District cited for mistreatment and harassment therein, on a consistent basis, is race" (doc. 38 at 23, pl. resp. to m.s.j.). However, as argued by the defendant, this is not, in and of itself, evidence that the alleged harassment was based on the plaintiff's race. The plaintiff has failed to present any evidence suggesting that any administrator's conduct was motivated by the plaintiff's protected characteristics. In her deposition, she states that she did not know why she was treated differently, but believes it was "because of [her] race" (doc. 32-10, pl. dep. 216). She admits that no employee of the defendant made any derogatory comment to her based upon any protected characteristic (*id.*). Based upon the foregoing, summary judgment should be granted on the plaintiff's hostile work environment cause of action.

### Retaliation

A *prima facie* case of retaliation in violation of Title VII requires proof (1) that the plaintiff engaged in protected activity; (2) that her employer took an adverse employment action; and (3) that a but-for causal connection existed between the protected activity and the asserted adverse action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2532-33 (2013); *Foster*, 787 F.3d at 250-53. In the context of a retaliation claim, an adverse employment action, is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006) (internal quotation marks omitted).

Without question, the majority of the plaintiff's allegations cannot establish an adverse employment action for purposes of a Title VII retaliation claim. *See Booth v. County Exec.*, C.A. No. TDC-15-2231, 2016 WL 2757367, at *5 (D. Md. May 11, 2016) (finding that the plaintiff's complaints his supervisor delayed supervision sessions, failed to timely sign off on necessary forms, and verbally embarrassed him in front of co-workers did not

constitute a retaliatory adverse employment action) (citing *Adams v. Anne Arundel Cty. Pub. Schs.*, 789 F.3d 422, 425, 431 (4th Cir.2015) (stating that a supervisor berating the plaintiff in front of colleagues did not establish an adverse employment action for purposes of a Title VII retaliation claim); *Cepada v. Bd. of Educ. of Baltimore Cty*. 814 F. Supp. 2d 500, 515 (D. Md. 2011) (stating that being subjected to yelling and criticism by a supervisor was not a retaliatory adverse employment action)).

Furthermore, the plaintiff cannot show a but-for causal connection existed between any protected activity and the asserted adverse actions against her. The plaintiff argues in her response to the motion for summary judgment that  Dr. Bricker's "actions" "were prompted by the results of this bullying incident in retaliation against her for assisting to gain resolve in the falsely accused African-American student incident" (doc. 38 at 17, pl. resp. to m.s.j.). However, the plaintiff has provided no evidence supporting this conclusory statement and has not even shown that Dr. Bricker was aware of the "bullying incident." *See Bradley*, 2015 WL 5158731, at *23 ("Without proof of the decision-maker's knowledge of his alleged protected activity, his claim cannot survive summary judgment."). The plaintiff further claims that she suffered retaliation when "one day after [she] escalated the grievance against Administrator Burke," she received an email stating that her pay would be docked for incremental sums totaling over $1,000 (*id.*). The defendant has presented evidence showing that this email was sent to several employees and was subsequently retracted (doc. 34-7, Avery aff. ¶ 5). The plaintiff has failed to present any evidence of a causal connection between her grievance and the email. Further, to the extent that the plaintiff claims that the defendant's "slow response in providing resolve for her recertification" (doc. 38 at 23, pl. resp. to m.s.j.) was in retaliation for her grievance, she has also failed to provide any proof of a causal connection between the two.

Furthermore, even if the plaintiff could establish a *prima facie* case of retaliation, the defendant has presented legitimate non-retaliatory reasons for its actions as discussed above. The plaintiff has failed to show the defendant's reasons were pretextual and that retaliation was the actual reason for the challenged employment actions.

*Foster*, 787 F.3d at 252.  Accordingly, summary judgment should be granted on the plaintiff's Title VII retaliation cause of action.

**Defamation**

To recover for defamation under South Carolina law, the plaintiff must prove: "(1)  a false and defamatory statement was made; (2)  the unprivileged publication of the statement to a third party; (3)  the publisher was at fault; and (4)  either the statement was actionable irrespective of harm or the publication of the statement caused special harm." *Erickson v. Jones St. Publishers, LLC*, 629 S.E.2d 653, 664 (S.C. 2006) (citation omitted).

The two statements that the plaintiff claims are defamatory are:  (1)  Mr. Burke's statement in the April 30, 2013, letter, "You accused the student of being a racist without any other credible proof than your perception;" and (2)  the March 1, 2013, email sent by Dr. D'Andrea stating that rudeness would not be tolerated (doc. 34-10, pl. dep. p. 192).

With regard to the statement by Mr. Burke in the letter, the plaintiff has provided no proof that the statement was shared outside the defendant's administration. A statement made in connection with an employer's bona fide inquiry into possible employee misconduct is qualifiedly privileged.[7] *Wright v. Sparrow*, 381 S.E.2d 503, 506-507 (S.C. Ct. App. 1989) (citing *Bell v. Bank of Abbeville*, 44 S.E.2d 328 (S.C. 1947)). "Communications between officers and employees of a corporation are qualifiedly privileged if made in good faith and in the usual course of business." *Murray v. Holnam, Inc.*, 542 S.E.2d 743, 749 (S.C. Ct. App. 2001) (citation omitted).  Where a defendant is entitled to a qualified privilege, a plaintiff can recover for defamation only if he or she can show that the defendant was motivated by actual malice in the publication of the allegedly defamatory statements. *Richardson v. McGill*, 255 S.E.2d 341, 342 (S.C. 1979).  Here, the plaintiff has failed to establish a genuine issue of material fact as to actual malice. *See Wright*, 381 S.E.2d at 507.

---

[7] The defendant raised in its answer the affirmative defense of privilege as to the defamation claim (doc. 24 at 5, answer).

With regard to Dr. D'Andrea's email, the plaintiff was not named in the email (doc. 34-9, D'Andrea aff. ¶ 7 & ex. E), and the plaintiff has presented absolutely no evidence that Dr. D'Andrea or an other employee of the defendant stated to a third party that Dr. D'Andrea was referring to the plaintiff in the March 2013 email.

In her response to the motion for summary judgment, the plaintiff states that "[v]arious members of the staff . . . establish many different parties who knew of the actions (and inaction in reprimand) applied to Plaintiff" (doc. 38 at 23, pl. resp. to m.s.j.). This conclusory statement is not evidence, and the plaintiff has produced no evidence supporting her claim. She also states that "[f]urther interactions were captured on video, . . . and several students of the Plaintiff were related to members of the Administration and employees listed in this document, establishing 'third party' recognition of the blatant acts of harassment both encouraged (Michelle Terry)[8] and carried out by students and faculty" (*id.* at 23-24). It is unclear what interactions on video the plaintiff is referring to or how such supports her claim of defamation as to the above two statements. The plaintiff's vague and conclusory allegations are insufficient to defeat summary judgment. As the plaintiff has failed to present evidence upon which a reasonable jury could find the defendant defamed her in any way, summary judgment should be granted on this cause of action.

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, it is recommended that the defendant's motion for summary judgment (doc. 34) be granted.

IT IS SO RECOMMENDED.

June 29, 2016                                         s/ Kevin F. McDonald
Greenville, South Carolina                   United States Magistrate Judge

---

[8] Ms. Terry was the teacher the plaintiff claims prompted the students to picket her "No Negativity Club" meeting (doc. 38 at 13, pl. resp. to m.s.j.).

26

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
300 East Washington Street
Greenville, South Carolina 29601

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).